Richmond

# BRUCE FARMS, INC.

v.

# RICHARD H. COUPE AND SUE S. COUPE

August 31, 1978.

Record No. 770453.

Present: All the Justices.

*J. Darrell Foster (Bangel, Bangel & Bangel,* on brief) for plaintiff in error.

*John M. Cloud* for defendants in error.

POFF, J., delivered the opinion of the Court.

The principal issue raised by this writ is whether, as the trial court ruled, the sale of a newly completed residence by a builder-vendor to the initial homeowner carries an implied warranty.

Bruce Farms, Inc., (defendant) was engaged in the construction and sale of new homes in a residential subdivision. In performance of a contract of sale, defendant executed and delivered, and Richard H. Coupe and Sue S. Coupe (plaintiffs) accepted and recorded, a deed of bargain and sale conveying one of these homes. The home was one of several surfaced with a veneer of concrete bricks defendant had purchased from Cavalier Concrete Products, Inc. Shortly after taking possession, plaintiffs discovered cracks in some of the bricks. Alleging breach of both express and implied warranties, plaintiffs sued defendant and Cavalier claiming damages "incident to the repair and replacement of the aforesaid defects and deficiencies". Subsequently, plaintiffs non-suited Cavalier, a bankrupt.

At the conclusion of plaintiffs' evidence, the trial court, sitting without a jury, granted defendant's motion to strike the evidence as to the alleged express warranty but denied a similar motion as

to implied warranty. By letter opinion, the court ruled that "the builder-developer-vendor of a new completed building may be liable for a breach of an implied warranty of the fitness of the intended use of the building." The final order entered December 10, 1976, awarded plaintiffs judgment in the sum of $9,840.

This appeal poses no issue founded upon express contractual warranty. The deed is silent.

[W]hen a deed is executed and accepted in performance of a prior preliminary contract, the deed, if unambiguous in its terms, and unaffected by fraud or mistake, must be looked to alone as the final agreement of the parties.

*Woodson v. Smith*, 128 Va. 652, 656, 104 S.E. 794, 795 (1920).

No warranty created by statute is involved.[1] So, we look to the common law which, "except as altered by the General Assembly", continues in force in Virginia. Code § 1-10 (Repl. Vol. 1973); *Commonwealth v. Holland*, 211 Va. 530, 532, 178 S.E.2d 506, 507 (1971).

Note that by the Civill Law, every man is bound to warrant the thing that he selleth or conveyeth, albeit there be no expresse warranty, but the Common Law bindeth him not, unless there be a warranty either in Deed or in Law for *Caveat emptor.* . . .

Coke, Littleton (3d ed. 1633) 102.

Coke's benediction upon the doctrine of *caveat emptor* foreshadowed the process whereby the doctrine became firmly entrenched in the common law of the seventeenth and eighteenth centuries. *See* Hamilton, *The Ancient Maxim Caveat Emptor*, 40 Yale L.J. 1133 (1931). Thereafter until the year 1931, the English courts and those in the common law jurisdictions of this country ruled with peremptory consistency that no warranties were to be implied in the sale of new or used dwellings. The first exception was suggested by way of dictum. In the English case of *Miller v. Cannon Hill Estates, Limited*, 2 K.B. 113 (1931), the court discovered a distinction which it felt justified an exception to the general rule. The court believed that, while the general rule should govern a sale by a builder-vendor of a newly constructed home, the

---

[1] The warranties created by the Uniform Commercial Code, Code §§ 8.2-313, -314, -315, are not, of course, applicable here. Code § 8.2-102.

law should presume a warranty of good materials, good construction, and fitness for habitation when a sale by such a vendor was made while the house was still under construction. Evidently, the court felt that the purchaser of an uncompleted house had no opportunity to inspect the finished product and necessarily had to rely upon the builder-vendor's apparent skill in the construction of a habitable residence.

Although the *Miller* exception to the general rule was mere dictum, it has been generally accepted as the law of England. *See A Conveyancer's Letter*, 85 L.J. 219 (1938); *Jennings* v. *Tavener*, [1955] 2 All.E.R. 769, [1955] 1 W.L.R. 932; 4 Halsbury's Laws of England (4th ed. 1973) 593. The logic of the distinction *Miller* drew was first challenged in this country in the dissenting opinion in *Levy* v. *Young Construction Co., Inc.*, 46 N.J. Super. 293, 134 A.2d 717 (1957). The minority believed that the elements of implied representation and buyer reliance were the same whether the house was completed or was in the process of construction at the time of sale. Later, other American jurisdictions expressly rejected the *Miller* distinction. *See e.g., Carpenter* v. *Donohoe*, 154 Colo. 78, 388 P.2d 399 (1964).

Today, it appears from the cases collected in Annot., 25 A.L.R.3d 383 (1969, Supp. 1977) that the "modern trend" of judicial authority favors implied warranties in sales by builder-vendors to initial vendees whether the sale occurred before or after construction was completed.[2] As defined in *Hartley* v. *Ballou*, 286 N.C. 51, 62, 209 S.E.2d 776, 783 (1974), the modern rule holds:

> [I]n every contract for the sale of a recently completed dwelling, and in every contract for the sale of a dwelling then under construction, the vendor, if he be in the business of building such dwellings, shall be held to impliedly warrant to the initial vendee that, at the time of the passing of the deed or the taking of possession by the initial vendee (whichever first occurs), the dwelling, together with all its fixtures, is sufficiently free from major structural defects, and is constructed in a workmanlike manner, so as to meet the standard of workmanlike quality then

---

[2] A comparable "modern trend" seems to be developing apace in residential landlord-tenant case law. *See e.g., Pugh* v. *Holmes*, 46 U.S.L.W. 2570 (Pa. Super. Ct. Phil. Dist., Apr. 13, 1978) (No.42).

prevailing at the time and place of construction; and that this implied warranty in the contract of sale survives the passing of the deed or the taking of possession by the initial vendee.

Illustrative of the reasons underpinning the new rule are those articulated by the court in *Rutledge* v. *Dodenhoff*, 254 S.C. 407, 413-14, 175 S.E.2d 792, 795 (1970):

> The rationale. . .is that the seller and buyer are not on an equal footing in such a transaction. [T]he primary purpose of the transaction is to provide the purchaser with a habitable dwelling and the transfer of the land is secondary. The seller holds himself out as an expert in such construction and the prospective purchaser, if he buys, is forced to a large extent to rely on the skill of the builder. This is true because the ordinary purchaser is precluded from making a knowledgeable inspection of the completed house not only because of the expense and his unfamiliarity with building construction, but also because the defects are usually hidden rendering inspection practically impossible. Under such circumstances, the purchaser is at the mercy of the builder-vendor.

*See also Humber* v. *Morton*, 426 S.W.2d 554, 562 (Tex. 1968), where the court said:

> The caveat emptor rule as applied to new houses. . .does a disservice not only to the ordinary prudent purchaser but to the industry itself by lending encouragement to the unscrupulous, fly-by-night operator and purveyor of shoddy work.

Acknowledging that this appeal poses an issue of first impression in this Commonwealth, and urging us to affirm the trial court's adoption of the modern rule, plaintiffs invoke an analogy they see in *Mann* v. *Clowser*, 190 Va. 887, 59 S.E.2d 78 (1950). There, where a builder-defendant agreed to construct a building on the plaintiff's land, we approved an instruction which told the jury that "in every contract for the performance of service the law presumes that the work shall be done in a workmanlike manner and in accordance with good usage and accepted practices in the community in which the work is done." *Id.* at 900, 59 S.E.2d at 84.

We find the analogy faulty. A contract to perform a service necessarily implies a covenant to perform according to prevailing

standards of competency; otherwise, performance would have no objective legal measure. In jurisdictions like Virginia where the common law applies, a conveyance of real estate carries no covenants except those expressly made.

Those who favor retention of the common law rule of *caveat emptor* argue that the buyer can protect himself against defects by conducting a proper inspection before purchase or by having experts do so; that the buyer can protect himself by obtaining an express warranty from the seller; that the cost of liability insurance which adoption of the modern rule might entail would disrupt market prices at the expense of both buyers and sellers; and that the use of the modern rule would trigger an avalanche of litigation involving claims for defects resulting from owner maintenance neglect rather than poor workmanship or inferior materials.

Those who support the modern rule contend that the average buyer is unqualified to conduct his own inspection for latent defects and unable to pay experts to do so; that the unsophisticated buyer knows little about express warranties while a seller experienced in the business of building and marketing can readily protect himself against the modern rule by making an express contractural disclaimer; that even if premiums for liability insurance were passed along in full to the buyer, the added protection against judgment-proof sellers would be worth the cost; that the application of the implied warranty rule to real estate sales would cause no greater burden on the courts than the application of that rule to sales of chattels has caused; and that, in any event, judicial economy is never justified at the expense of justice.

If the modern rule is to be adopted, its scope must be precisely defined. Should it apply only when the seller is the builder? Should it be confined to the sale of houses under construction or those newly constructed or extended to the sale of renovated homes? Should it be limited to single-family detached dwellings or should it also reach owner-occupied condominium units or duplex houses? Should the warranty cover materials, fixtures, and other physical appurtenances?

If a warranty is to be implied, both the seller and the buyer need to know precisely what it is and how long it continues after the

sale. On these points, the courts which have adopted the modern rule do not agree. A warranty of fitness for habitation is one thing; a warranty of fitness for the use intended is another. A warranty of workmanlike construction may mean one thing in one community and something else in another. The same is true of a warranty of the quality of materials used in construction. A warranty which extends for a month after sale creates one package of rights and liabilities; a warranty which continues for a year creates a bigger package with different contents.

Finally, if a warranty is to be implied, the measure of damages for its breach must be determined. Some courts have held that the buyer is entitled only to direct damages measured by the cost of repairs; others have held that the buyer is entitled as well to consequential damages, including all expenses of all work occasioned by the repairs. Still other courts have ruled that the buyer is entitled only to the difference in market value between the home as constructed and the home as warranted. Section 346 of the Restatement of the Law of Contracts states the damage formula in alternatives.

We express no view whether the new rule is better than the old, for we must apply the law as we find it to be. We believe that the decision whether a common law rule of such ancient vintage as the one at bar should be reversed is one properly within the province of the General Assembly. The issue involves a multitude of competing economic, cultural, and societal values which courts are ill-equipped to balance, a fact best illustrated by the disparate conclusions reached by the several courts which have tinkered with the common law rule. On the other hand, the legislative machinery is specially geared to the task. A legislative change in the law is initiated by introduction of a bill which serves as public notice to all concerned. The legislature serves as a forum for witnesses representing interests directly affected by the decision. The issue is tried and tested in the crucible of public debate. The decision reached by the chosen representatives of the people reflects the will of the body politic. And when the decision is likely to disrupt the historic balance of competing values, its effective date can be postponed to give the public time to make necessary adjustments.

Accordingly, we will reverse the judgment of the trial court and enter final judgment here for defendant.

*Reversed and final judgment.*